**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**Case No. 5:10-cv-116**

|  |  |
|---|---|
| V & M, INC. d/b/a COSTA INTERNATIONAL on behalf of itself and all others similarly situated,<br><br>        Plaintiff,<br><br>HICKORY SPRINGS MANUFACTURING COMPANY, VALLE FOAM INDUSTRIES, INC., DOMFOAM INTERNATIONAL, INC., THE CARPENTER COMPANY, THE WOODBRIDGE GROUP, FLEXIBLE FOAM PRODUCTS, INC., SCOTTDEL, INC., FOAM EX INNOVATIONS, INC., FUTURE FOAM, INC., VITAFOAM PRODUCTS CANADA LIMITED, VITAFOAM, INC.,<br><br>        Defendants. | **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

This case stems from defendants' Foamex Innovations Inc., Hickory Springs Manufacturing Company, Valley Foam Industries, Inc., Domfoam International, Inc., The Carpenter Company, The Woodbridge Group, Flexible Foam Products, Inc., Scottdel, Inc., Future Foam, Inc.; Vitafoam Products Canada Limited and Vitafoam Inc. (collectively, "Defendants"), price fixing and anticompetitive agreements in the market for polyurethane foam in the United States between at least 1999 and the present. On or about July 27, 2010, agents

from the Federal Bureau of Investigation (the "FBI") raided the offices of Defendant The Carpenter Company ("Carpenter") – the world's largest manufacturer of polyurethene foam – as part of a multi-jurisdictional investigation of polyurethane foam manufacturers. FBI agents seized documents and forced offices at Carpenter to close. In a public statement following the raid Carpenter confirmed the government investigation of Carpenter and its competitors: "In connection with a multi-jurisdiction investigation of the pricing practices of polyurethane foam products, the U.S. government has required that manufacturers of polyurethane foam, including Carpenter Co., produce information and documents." Plaintiff V & M, Inc. d/b/a Costa International ("V & M") brings this action for damages and injunctive relief under Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1, and alleges as follows based on personal knowledge as to itself and on information and belief as to all other allegations:

## NATURE OF ACTION

1.      This case arises out of a conspiracy among defendants and their coconspirators to fix the prices of polyurethane foam and polyurethane foam products ("polyurethane foam"). Starting in at least 1999 and continuing to present, defendants conspired to fix, raise, maintain and/or stabilize prices of polyurethane foam.

2.      Defendants' actions achieved their desired effect in raising and stabilizing prices for polyurethane foam even in the case of drastically declining demand.

3.      Demand for Polyurethane foam is driven in part by the overall strength or weakness of the U.S. economy. However, despite the severe recession that began in 2008 – after experiencing a sharp increase in the early part of the Class Period, defined below – prices for polyurethane foam did not decrease in 2008 but instead rose sharply in mid-2008. *See* Figure 1.

This pricing behavior runs counter to basic economic theory which dictates that prices in a competitive market typically fall in the face of declining demand.



4.    This case is brought as a class action on behalf of all direct purchasers who, from at least as early as 1999 to present (hereinafter, the "Class Period"), purchased polyurethane foam directly from one or more of the Defendants or their co-conspirators.

5.    As alleged herein, defendants explicitly agreed with each other to charge supra competitive prices for polyurethane foam.  Price increases during the class period were the result of coordinated conduct among the defendants to fix prices.  Defendants also agreed to allocate certain customers.

6.    As a direct and proximate result of Defendants' unlawful conduct and price-fixing conspiracy, plaintiff and the members of the Class as defined in ¶ 95 below have paid unlawful,

artificially higher prices for polyurethane foam than than they would have paid in a competitive market and therefore have suffered overcharges and antitrust injury.

7.     Plaintiff has directly purchased polyurethane foam from one or more of the defendants during the Class Period.  Plaintiff brings this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26 as a class action to recover damages, the costs of suit, including reasonable attorneys' fees, to enjoin the continuation of the conspiracy, and for such other and further relief as is afforded under the antitrust laws of the United States for Defendants' violations of Section 1 of the Sherman Action, 15 U.S.C. §1.

## PLAINTIFF

8.     Plaintiff V & M, Inc. d/b/a Costa International is a corporation organized under the laws of Florida with its principle place of business located at 7272 N.W. Terrace, Medley, Florida 33166.  During the Class Period, V & M purchased polyurethane foam directly from one or more of the Defendants.

9.     The prices V & M paid to Defendants for polyurethane foam were greater than the prices it would have paid absent the conspiracy alleged herein, and V & M has therefore been injured in its business and property by reason of Defendants' antitrust violations.

## DEFENDANTS

10.     Defendant The Carpenter Company ("Carpenter") is a privately owned and operated company with its headquarters located at 5016 Monument Avenue, Richmond, Virginia, 23230.  Carpenter operates from around 30 locations in the United States, 5 locations in Canada and around 20 locations in Europe.  During the Class Period, Carpenter directly sold polyurethane foam throughout the United States.

11.     Carpenter is the largest manufacturer of polyurethane foam cushioning in the world.  It has divisions in the following areas: air filter media, bedding, carpet cushion, chemical, chemicals systems, consumer products, expanded polystyrene systems, flexible foam packaging, furniture, molded manufacturing, polyester fiber, and tire products.

12.     Defendants Flexible Foam Products, Inc. ("Flexible Foam") is a privately owned and operated Ohio company with its headquarters located at 12575 Bailey Road, Spencerville, Ohio 45887 and operations in Texas, Indiana, Florida and Wisconsin.  It is a subsidiary of Ohio Decorative Products, Inc., also of Spencerville, Ohio.  During the Class Period, Flexible Foam directly sold polyurethane foam throughout the United States.

13.     Flexible Foam manufactures polyurethane foam and rebond products for customers in the bedding, flooring, furniture, packaging, and automotive industries.

14.     Defendant Foamex Innovations Inc., formerly known as Foamex International, Inc. ("Foamex"), is a privately owned and operated company with its headquarters located at Rose Tree Corporation Center II, 1400 N. Providence Road, Suite 2000, Media, PA 19063-2076.  During the Class Period, Foamex sold polyurethane foam throughout the United States.

15.     Foamex provides foam for the home, healthcare, electronics, industrial, personal care and transportation markets.  Its foam is used in automotive cushioning, shipping packages, beds and furniture, as well as personal electronics.  Foamex also provides components for filters, dispensers, gaskets and seals in everything from blood oxygenators to computer disk drives.

16.     Defendant Hickory Springs Manufacturing Company ("Hickory Springs") is a North Carolina corporation with its headquarters located at 235 2nd Avenue, NW, Hickory, NC 28601.  During the Class Period, Hickory Springs directly sold polyurethane foam throughout the United States.

17.     Hickory Springs Manufacturing Company is one of the nation's largest integrated component manufacturers and suppliers for the furniture and bedding industries with more than 60 operating facilities in the United States and throughout the world.  Hickory Springs is one of the largest producers of foam in the United States.

18.     Defendant Scottdel Inc. ("Scottdel") is a privately held corporation with its headquarters located at 400 Church Street, Swanton, Ohio 43558.  During the Class Period, Scottdel directly sold polyurethane foam throughout the United States.

19.     Scottdel began manufacturing bonded urethane carpet cushion in 1961 and manufactures a complete line of commercial and residential bonded urethane cushions ranging in density from 3.5 pounds to 10 pounds per cubic foot.

20.     Defendant Future Foam, Inc. ("Future Foam") is a privately owned and operated company with its headquarters located in 1610 Avenue N, Counsel Bluffs, IA 51501.  During the Class Period, Foamex sold polyurethane foam throughout the United States.

21.     Future Foam produces foam products for bedding, foam blocks, carpet cushion, furniture, and packaging.

22.     Defendant Vitafoam Products Canada Limited ("Vitafoam Canada") is a privately owned and operated company with its headquarters located at 150 Toro Road, North York, Ontario M3J 2A9, Canada.  During the Class Period, Vitafoam sold polyurethane foam, either directly or through its affiliates, throughout the United States.

23.     Vitafoam Canada manufactures all types of flexible polyurethane foam for use in furniture, bedding and automotive applications, including packaging, medical, industrial and a full range of memory foams.  It also produces latex mattresses and toppers.

24. Defendant Vitafoam Inc. ("Vitafoam Inc.") is a privately owned and operated company with its headquarters located at 2215 Shore Drive, High Point, NC 27263. During the Class Period, Vitafoam Inc. sold polyurethane foam, either directly or through its affiliates, throughout the United States. Collectively, Vitafoam Canada and Vitafoam Inc. are referred to as Vitafoam.

25. Vitafoam, Inc. manufactures plastic netting, automotive products, general trade, and nonwoven products. The company offers polyurethane foam products for packaging, furniture, and upholstery industries, marine industry products, such as fenders, drainable boat seats, waterproof cushions, air circulation pads, and filtration devices and foam; and foam for fabric producers, laminators, trim companies, and original equipment manufacturers in the automotive industry.

26. Defendant The Woodbridge Group ("Woodbridge") is a Canadian corporation with its headquarters located at 4240 Sherwoodtowne Blvd, Mississauga, Ontario, L4ZG6, Canada. During the Class Period, Woodbridge directly sold polyurethane foam throughout the United States.

27. Woodbridge's primary focus is supplying foam for automotive components, but also supplies other sectors including: commercial and recreational transportation, building products, construction, packaging and several consumer and industrial markets.

28. Defendant Valle Foam Industries, Inc. ("Valle") is a privately owned and operated corporation with its headquarters located at 4 West Dr., Brampton, ON L6T 2H7 Canada. During the Class Period, Valle directly and/or through its control of its affiliates sold polyurethane foam throughout the United States.

29.     Valle manufacturers slab stock polyurethane foams for the furniture, bedding, packaging, carpet and children's toy industries.

30.     Defendant Domfoam International, Inc. ("Domfoam") is a subsidiary of Valle Foam Industries, with its headquarters located at 8785 Langelier Blvd., Montreal, Quebec, HIP 2C Canada.  During the Class Period Domfoam sold polyurethane foam throughout the United States.

31.     Domfoam is a manufacturer/wholesaler of sponge and polyurethane foam.  Since its incorporation in 1963, Domfoam has grown to be Canada's leading and most diversified manufacturer of ether, ester, rebounded flexible polyurethane foams and visco elastic foam.

## CO-CONSPIRATORS AND AGENTS

32.     Upon information and belief, other persons, corporations, and entities not named as defendants herein, have participated in the unlawful conspiratorial activity alleged herein in violation of the antitrust laws of the United States.

## JURISDICTION AND VENUE

33.     This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337 and 15 U.S.C. §§15, 26.

34.     Venue is proper in this district pursuant to 28 U.S.C. §§15, 22 and 26 and pursuant to 28 U.S.C. §1381 (b), (c) and (d), because at all times relevant to this Complaint: (a) Defendants transacted business, were found, or acted through subsidiaries or agents present in this district; (b) a substantial part of plaintiffs' claims occurred in this district; (c) a substantial portion of the affected interstate trade and commerce described below has been carried out in this district.

35.     This Court has *in personam* jurisdiction over each of the defendants because, *inter alia*, each of the defendants: (a) committed acts in furtherance of the conspiracy alleged herein in this district and directed the unlawful conspiracy through persons and entities located in this district, including fixing the prices of polyurethane foam sold to purchasers in this district; (b) transacted business in polyurethane foam and other products in this district; (c) maintain and have maintained continuous and systemic contacts with this district over a period of years; (d) purposefully availed itself of the benefits of doing business in this district. Accordingly, each of the defendants maintains minimum contacts with this district more than sufficient to subject it to service of process and sufficient to comply with due process of law.

## FACTUAL ALLEGATIONS

## The Polyurethane Foam Market

36.     Polyurethane foam includes different types of foam consisting of polymers made of molecular chains bound together by urethane links. It can be flexible or rigid, but generally has a low density. Flexible polyurethane foam is most often used in bedding and upholstery, while the rigid variety is used for products like thermal insulation and in automobile dashboards.

37.     Polyurethane foams are used in beddings, packaging, seat cushioning, shipping pads and shipping cushioning, car interiors, fluid filtration systems, anti-noise and vibration systems in aircraft, medical devices, and in a number of consumer applications.

38.     Although the four classes of polyurethane have different physical properties, they are all created by varying a basic additional reaction involving a diol or polyol, a diisocyanate, and water. The kinds and amounts of raw materials used in the manufacturing process help determine how the final product performs.

39.     To manufacture foam for cushioning, two basic procedures are used.  In the slabstock process, a continuous slab is cut, stored and allowed to cure for up to 24 months.  The cured foam is subsequently fabricated into useful shapes, usually for use in furniture and bedding.

40.     In foam molding, individual items are produced by pouring foam chemicals into specially shaped molds and allowing the foam reaction to take place.  This process is used primarily for automotive cushioning and the foam is sometimes referred to as "semi-flexible."

41.     There are few acceptable alternatives for polyurethane foam.  According to the Polyurethane Foam Association, "comparing [polyurethane foam] to alternative materials in the areas of economics, comfort potential, ease of use, and durability, there is not an acceptable substitute for polyurethane foam."

42.     In 2010, domestic revenue for the polyurethane foam industry is expected to be approximately $12 billion.  Furniture and furnishings account for 36.7% of industry revenue.  The major products in this segment include pillows, seating, cushioning, mattress cores and quilt rolls.  Transportation products account for 19.1% of industry revenue.  This segment includes foam used for automotive seating, protective cushioning and sound insulation in cars and light trucks.  Building and construction account for 12% of industry revenue.  Packaging products account for 5.3% of industry revenue.  Major packaging products include protective shipping pads and food containers.

43.     There has been a recent trend towards consolidation within the industry.  Major players within this industry have been active in acquiring smaller companies and other competitors over the course of the last ten years.  For example in 2007, Defendant Carpenter

acquired its European competitor, Dumo NV. Carpenter owns approximately 16.3% of the market share in this industry.

44.     After its parent corporation was acquired in 2006, Vitafoam Inc. sold one plant to Olympics Products, LLC, a joint venture between Woodbridge and Hickory Springs. It sold another plant to Flexible Foam Products.

45.     Defendants are most of the major North American polyurethane foam producers representing a significant portion of the United States market. There are virtually no imports of products in this industry.

## Defendant Vitafoam's Admission of a Conspiracy

46.     On information and belief, in February 2010, Vitafoam voluntarily approached the U.S. Department of Justice, Antitrust Division, to self-report evidence of illegal antitrust activities amongst itself and other companies and individuals in the industry ("competitors") and to seek acceptance into the Antitrust Division's Corporate Leniency Program. Since that time, Vitafoam and its employees have been cooperating with this investigation.

47.     On information and belief, as a result of its application, Vitafoam has received a conditional leniency letter from the DOJ's Antitrust Division. This fact, in and of itself, is significant. It means that Vitafoam has admitted to participation in a conspiracy to violate the antitrust laws. The significance of obtaining a conditional leniency letter was explained by Scott D. Hammond, Deputy Assistant Attorney General for Criminal Enforcement, in a November 19, 2008 presentation available on the DOJ's website at

www.usdoj.gov/atr/public/criminal/239583.htm:

> *Does a leniency applicant have to admit a criminal violation of the antitrust laws before receiving a conditional leniency letter?*

Yes.  The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction.  Thus, *the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter*.  Applications that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program.

When the model corporation conditional leniency letter was first drafted, the Division did not employ a marker system.  Thus, companies received conditional leniency letters far earlier in the process, often before the company had an opportunity to conduct an internal investigation.  However, the Division's practice has changed over time.  The Division now employs a marker system and the Division provides the company with an opportunity to investigate thoroughly its own conduct.  While the applicant may not be able to confirm that it committed a criminal antitrust violation when it seeks and received a marker, by the end of the marker process, *before it is provided with a conditional leniency letter, it should be in a position to admit to its participation in a criminal violation of the Sherman Act*.  The Division may also insist on interviews with key executives of the applicant who were involved in the violation before issuing the conditional leniency letter.  *A company that argues that an agreement to fix prices, rig bids, restrict capacity, or allocate markets might be inferred from its conduct but that it cannot produce any employees who will admit that the company entered into such an agreement generally has not made a sufficient admission of criminal antitrust to be eligible for leniency.  A company that, for whatever reason, is not able or willing to admit to its participation in a criminal antitrust conspiracy is not eligible for leniency*.  Previously the model conditional leniency letters referred to the conduct being reported as "*possible* […price fixing, bid rigging, market allocation] or other conduct violative of Section 1 of the Sherman Act." (emphases added).

### The Conspiracy to Fix Prices and Allocate Customers

48.     A former President of Vitafoam, who worked for Vitafoam from the 1960s until October 2008, along with other individuals from Vitafoam, directly participated in the long-running price fixing and customer allocation conspiracy alleged herein relating to polyurethane foam in North America.

49. Another Vitafoam employee, a former vice president of Sales and Marketing for Vitafoam, worked in the polyurethane foam industry since 1963. He first worked for Woodbridge, and then in 1973 joined Vitafoam's predecessor, Pre-Fab Cushioning Products. This former vice president worked for Vitafoam in Canada until March 2009 when he retired. He, along with other individuals at Vitafoam, as well as other companies, had been involved in a long-running price fixing and customer conspiracy that included North America and the United States.

50. The impetus for the conspiratorial conduct was typically increases in raw material costs. Defendants (or "foamers" as they are referred to at times in the industry) utilize chemicals including polyols and toluene diisocyanate (or "TDI") in the manufacturing of polyurethane foam.

51. When Defendants' raw material suppliers announced price increases for chemical ingredients of foam, such as polyols and TDI, the foamers contacted each other. During the communications, the Defendants discussed supporting specific price increases and the timing of announcements regarding an effective date of such increases. The former president of Vitafoam has knowledge that this type of concerted activity has gone on for a least 20 to 25 years.

52. During this period, there was an understanding and agreement among the competitors in the foam industry to collectively support price increases. This understanding and agreement was reached in actual discussions among competitors about the percentage of price increases, the dates of the increases, and how the conspirators would announce the increases often with the same effective dates. Price increase announcement letters were then mailed to customers, reflecting the prices determined by the conspirators.

53.     The former president of Vitafoam, along with his subordinates, had conspiratorial discussions with competitors concerning this conspiracy to fix prices and to allocate customers.

54.     Vitafoam had a policy of not having conversations with competitors, but this policy was merely window-dressing and was not followed in practice.

55.     As part of the conduct to coordinate or support price increases, the former Vitafoam president instructed his sales people to send copies of their draft price increase letters to competitors.

56.     In addition to discussions he had with competitors, the salespeople of Vitafoam also had discussions with the other defendants concerning price increases and the timing of those increases.  These discussions involved inquiries as to whether each competitor was going to support the price increase, when the price increases were going to be issued and what the effective dates would be of the increases.

57.     The former vice president and others at Vitafoam also participated in conspiratorial conduct with many individuals employed by numerous companies.

58.     The former vice president of Vitafoam had communications in furtherance of the conspiracy with Defendant Carpenter Group.  They had discussions on multiple occasions involving price increases concerning a shared customer.  In an effort to coordinate their price increases and to make sure those increases went through for the mutual customer, they called each other and sent by fax copies of draft price increase letters.

59.     Valle Foam also communicated with other Defendants – their competitors – by telephone and they also faxed each other copies of their draft price increases letters that would be sent to customers so as to coordinate and collude on price increase percentages and their effective dates.

60.     During the class period, Vitafoam employees contacted Carpenter employees regarding price increases and their effective dates.

61.     During the price increase periods, Defendants also agreed to avoid each other's customers and not attempt to take business or market share from one another.

62.     A former Woodbridge employee who was employed in Ontario, Canada, from 1986 until 2009 participated in the conspiracy. While working at Defendant Woodbridge, this employee served most recently as vice president of Commercial Sales where he had authority to determine prices. This former Woodbridge employee is currently employed at Vitafoam as their Vice President of Sales, a position he has held since April 2009. In his current position, he has authority to determine prices. The current Vitafoam vice president, along with other individuals employed by Defendants, has been engaged in a long-running price fixing and customer allocation conspiracy.

63.     This current Vitafoam vice present has engaged in the conspiratorial activity by reaching understandings and agreements on price increases with most of Vitafoam's competitors for the same percentage on the same effective date. He has had personal involvement in this conduct since the early 1990's when he became involved with pricing at Woodbridge, and this involvement continued when he joined Vitafoam. This activity involved the U.S. and Canadian markets. The objective of the price increase scheme was for the conspirators to collectively pass raw material cost increases on to their customers, as well as to maintain their respective market shares.

64.     Participants in this conduct with the current Vitafoam vice president included Woodbridge, Vitafoam, Foamex, Carpenter, Vitafoam U.S., Future Foam, Hickory Springs,

Scottdel, Valle and Flexible Foam.  The Vitafoam vice president coordinated price increases among competitors, as did counterparts at the competitors.

65.     The current Vitafoam vice president's discussions relating to coordinating price increases among competitors were conducted primarily by means of telephone, electronic mail, and in-person meetings.  In-person discussions frequently took place at meetings of the Polyurethane Foam Association ("PFA") trade group.

66.     The current Vitafoam vice present and other participants in this conspiracy took numerous steps to avoid detection of their conspiracy.  At times, full names would not be used in correspondence and instead participants would only using first names or initials.  Conspirators took advantage of attending the PFA meetings along with their competitors and met to discuss coordinating price increases outside of the formal meetings.  Similarly, competitors visited each other's manufacturing facilities for the purported purpose of sharing technological and operational advances, but were actually using the opportunity to discuss coordinated price increases.  Another method to avoid detection involved going to a local Staples or other office store to use the public facsimile machines to send each other price increase letters without the identifying facsimile transmission banner.

67.     On May 26, 2010, Vice President of Sales for Vitafoam attended a PFA meeting in Baltimore, MD.  While there, he discussed foam pricing with competitor Flexible Foam.  This conversation included him being asked why Vitafoam was not raising prices or following the increase.

68.     The former Director of Corporate Engineering at Woodbridge is now the President of Vitafoam.  He worked at Woodbridge from 1985 until January 2008.  As the Director of Corporate Engineering he had authority to determine prices at Woodbridge.  As the

President of Vitafoam, a position he has held since August 2008, he now has authority to determine prices at Vitafoam. He, along with other individuals of defendant companies, also participated in the long-running price fixing and customer allocation conspiracy.

69. Discussions with competitors in the foam industry involving the current President of Vitafoam while he was at Woodbridge, included conversations about legitimate topics like business development or potential joint ventures, and then ultimately led to conspiratorial conversations about price increases. These discussions about coordinating pricing took place during in-person discussions, electronic mail communications and telephone conversations.

70. This individual participated in conspiratorial discussions concerning pricing in the foam industry while at Woodbridge and Vitafoam with various competitors. These discussions led to a clear understanding and agreement that after the participants would discuss the price increases and effective dates, they would then implement increases in accordance with that coordination.

71. Virtually every known price increase, going back to at least 1999 and until Vitafoam's entry into the leniency program in the industry, has involved conspiratorial discussions among Defendants on pricing. Chemical price increases from the major suppliers were impetus for discussions.

72. While at Vitafoam, the current president has received Vitafoam's competitors' draft increase letters from the other Vitafoam personnel.

**Efforts to Enforce the Conspiracy**

73. Defendants also undertook efforts to police the conspiracy. Participants, including former Vice President of Vitafoam, followed up after discussions with competitors to see if the specific price increases and effective dates were actually being implemented. For

example, the Vitafoam Vice President called Valle and Carpenter to see if those competitors were putting the increases through as they had discussed and agreed.

**Industry Meetings**

74. Representatives of Defendants have regularly met through such organizations as the Polyurethane Foam Association ("PFA"), the International Sleep Products Association ("ISPA"), and the Surfaces, a trade group which includes polyurethane carpet underlay producers.

75. Defendants were well aware of the risk of anticompetitive conduct at trade association meetings. For example, the Spray Polyurethane Foam Association ("SPFA") admits that "[t]rade associations must be acutely sensitive to antitrust issues . . . because their meetings also may provide opportunities to reach unlawful agreements." *See* http://www.sprayfoam.org/index.php?page_id=4487.

76. As previously stated, representatives from defendant companies reached agreements at these industry meetings held in the United States and abroad.

77. Representatives of defendants used these trade association meetings as nothing more than "meet-and-greet" sessions with their competitors.

78. Representatives of defendants disguised their attendance at these events as information gathering and merely used them as an opportunity to fix prices and divvy up their customers in person.

79. Representatives of defendants not only had no intention of learning about the market at these meetings, they essentially controlled the market and attended these meetings to further demonstrate their control.

**GOVERNMENT INVESTIGATION**

80.     On or about July 27, 2010, it was publicly disclosed that the FBI, as part of a multi-jurisdictional investigation of polyurethane foam manufacturers, raided the offices of Carpenter and its competitors and seized documents and shuttered certain of Carpenter's offices.

81.     To obtain search warrants, as it appears that it did here against Defendant Carpenter and other Defendants, the United States must demonstrate to a Magistrate Judge probable cause, recounted in a sworn affidavit or testimony grounded on reasonably trustworthy information, that it would obtain evidence of an antitrust violation as a result of executing the search warrant. That is, the United States had to have evidence sufficient to warrant a person of reasonable caution to believe that raiding the offices of a seemingly lawful business would uncover evidence of antitrust violations.

82.     The FBI raid lends further support to the allegations of anticompetitive conduct in the market for polyurethane foam.

### ACCURAL OF CLAIM, CONTINUING VIOLATION, EQUITABLE TOLLING, AND FRADULENT CONCEALMENT

83.     Plaintiff had no knowledge of the combination and conspiracy alleged herein, or of any facts that might have led to the discovery thereof in the exercise of reasonable diligence, prior to disclosure of the FBI raid of Carpenter and Vitafoam's cooperation with the DOJ.

84.     Defendants and their co-conspirators have committed continuing violations of the antitrust laws resulting in monetary injury to Plaintiffs. These violations constitute injurious acts which restart the applicable statute of limitations.

85.     In addition, Defendants' co-conspirators agreement, understanding and conspiracy in violation of the antitrust laws was kept secret. As a result, Plaintiff and the Class members were unaware of defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for polyurethane foam throughout the United States

throughout the Class Period. Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

86. Plaintiff and the Class members did not discover, nor could have discovered through reasonable diligence, that defendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was initially commenced, because defendants and their co-conspirators used deceptive and secret methods to avoid detection and to affirmatively conceal their violations.

87. Neither defendants nor their co-conspirators told Plaintiff or other class members that they were fixing prices and allocating customers, or engaging the other unlawful collusive practices alleged herein. By its very nature, defendants' and their co-conspirators' conspiracy was inherently self-concealing.

88. Defendants and their co-conspirators engaged in a successful price-fixing and customer allocation conspiracy, which they affirmatively concealed:

        a. By meeting secretly (including use of private telephone communications) to discuss prices, customers, and markets of polyurethane foam sold in the United States and elsewhere;

        b. By agreeing among themselves at meetings and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme;

        c. By using first names and initials on written communications to disguise their source;

        d. By holding secret meetings outside and separate from formal trade association meetings defendants were publically attending;

e.  By disguising price-fixing meeting and communications as technical and operational meetings;

f.  By using fax machines at publicly available outlets to disguise the source of faxes.

## ANTITRUST INJURY

89.  The unlawful contract, combination and/or conspiracy alleged above had and is having, *inter alia*, the following effects:

a.  Prices charged by defendants and their co-conspirators to plaintiff and the members of the Class for Polyurethane foam products were maintained at artificially high and supracompetitive levels;

b.  Plaintiff and members of the Class were required to pay more for polyurethane foam than they would have paid in competitive marketplace unfettered by defendants' and co-conspirators' collusive and unlawful price-fixing; and

c.  Plaintiff and members of the Class have been deprived of the benefits of free, open and unrestricted competition in the market for polyurethane.

90.  During and throughout the period of the contract, combination or conspiracy alleged above, plaintiffs and members of the Class directly purchased polyurethane foam in the United States.

91.  Plaintiff and the other Class members paid more for the polyurethane foam than they would have paid under the conditions of free and open competition.

92. As a direct and proximate result of the illegal combination, contract or conspiracy alleged above, plaintiff and the members of the Class were injured and financially damaged in their business property, in amounts that are not presently determined.

93. This is antitrust injury of the type that the federal laws were meant to punish and prevent.

## **CLASS ACTION ALLEGATIONS**

94. Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the proceeding paragraphs of this Complaint.

95. Plaintiff brings this action on behalf of itself and the members of the Class comprising:

> All persons or entities which purchased polyurethane foam directly from Defendants or their unnamed co-conspirators from January 1, 1999 to the present. Excluded from the Class are governmental entities, Defendants, their co-conspirators and their representatives, parents, subsidiaries and affiliates.

96. Plaintiff brings this action on its behalf and as a class action under Rule 23(a), 23(b), and 23(b)(2) of the Federal Rules of Civil Procedure on behalf of all members of the Class.

97. Due to the nature of the trade and commerce involved, plaintiff believes the Class numbers in the thousands, the exact number and identities being known only by Defendants.

98. The Class is so numerous and geographically dispersed that joinder of all members is impracticable.

99. Class members are identifiable from information and records in the possession of Defendants.

100.    There are questions of law and fact common to the Class.  These common questions relate to the existence of the conspiracy alleged and to the type and common pattern of injury sustained as a result thereof.  The questions include but are not limited to:

a.   Whether defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize the price charged for polyurethane foam sold in the United States;

b.   The identity of participants in the conspiracy;

c.   The duration of the conspiracy alleged in this complaint and the nature and character of the acts performed by defendants and their co-conspirators in furtherance of the conspiracy;

d.   Whether the alleged conspiracy violated Section 1 of the Sherman Act;

e.   Whether the conduct of defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of Plaintiff and other members of the Class;

f.   The effect of defendants' conspiracy on the prices of polyurethane foam in the United States during the Class Period; and

g.   The appropriate measure of damages sustained by plaintiff and other members of the Class.

101.    Plaintiff is a member of the Class.  Plaintiff's claims are typical of the claims of other members of the Class, and plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff bought polyurethane foam directly from one or more of the defendants.  Plaintiff's interests are aligned with, and not antagonistic to, those of other members

of the Class. In addition, plaintiff is represented by competent counsel experienced in the prosecution of class action antitrust litigation.

102.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standard of conduct for defendants.

103.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues related to liability and damages.

104.    A class action is superior to other available methods of the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that numerous individual actions would engender. Class treatments will also permit the adjudication of relatively small claims by members of the Class who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## INTERSTATE TRADE AND COMMERCE

105.    The conduct of defendants and their co-conspirators affected the continuous flow of interstate trade and commerce of the United States, in that *inter alia*;

       a.   Defendants and their co-conspirators have sold polyurethane foam throughout the United States;

b.  Defendants and their co-conspirators have each used instrumentalities of interstate commerce to sell polyurethane foam throughout the United States;

c.  In furtherance of the conspiracy alleged herein, defendants have traveled between states and have exchanged communications through interstate wire communications and via U.S. mail; and

d.  The conspiracy alleged herein has affected billions of dollars of commerce.  Defendants and their co-conspirators have inflicted antitrust injury by artificially raising prices paid by plaintiff and other entities who are themselves engaged in commerce.

## CLAIM FOR RELIEF

### For Violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act

106.  Plaintiff re-alleges and incorporates each and every allegation set forth above as if fully written herein.

107.  From a date unknown, but beginning at least as early as 1999 and continuing through the present, defendants and their co-conspirators have combined, conspired and/or contracted to restrain interstate trade in violations of Section 1 of the Sherman Act, 15 U.S.C. §1, and Section 4 of the Clayton Act, 15 U.S.C. §15.

108.  In furtherance of the unlawful conspiracy, each of defendants and their co-conspirators has committed overt acts, including *inter alia*:

a.  Agreeing to charge prices at certain levels and otherwise agreeing to fix, increase, maintain and/or stabilize prices of polyurethane foam sold in the United States;

b. Communicating with co-conspirators regarding prices to be charged for polyurethane foam;

c. Agreeing to allocate customers;

d. Meeting with co-conspirators in order to keep the existence of the conspiracy unknown so as to foster the illegal anti-competitive conduct described herein; and

e. Refraining from competing by refusing to offer polyurethane foam at prices below the agreed-upon fixed price.

109. Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating unlawful arrangements to fix, maintain, raise and/or stabilize prices of polyurethane foam.

110. Plaintiff and the members of the Class, therefore, have been injured and financially damaged in their respective businesses and property in an amount to be determined according to proof and are entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

111. The conduct of defendants and their co-conspirators constitutes a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

## PETITION FOR RELIEF

WHEREFORE, plaintiff petitions that:

A. The Court determines that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that plaintiff be appointed class representative and that plaintiff's counsel be appointed as counsel for the class.

B. The contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

C. Judgment be entered for plaintiff and members of the Class against defendants, jointly and severally, for three times the amount of damages sustained by plaintiff and the Class as allowed by law, together with the cost of the action, including reasonable attorneys' fees, pre- and post-judgment interest.

D. Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf,  be permanently enjoined and restrained from, in any manner:

   a. Continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having similar purpose or effect and from adopting or following any practice, plan, program or device having a similar purpose or effect; and

   b. Communicating or causing to be communicated to any other person engaged in the manufacture, distribution or sale of polyurethane foam except to the extent necessary in connection with bona fide sales transactions between the parties to such communications.

E. Plaintiff and members of the Class have such other, further and different relief as the case may require and the Court may deem just and proper under the circumstances.

**JURY DEMAND**

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, plaintiff demands a jury trial of all issues triable by jury.

Dated:  August 18, 2010

Respectfully submitted,

THE VAN WINKLE LAW FIRM

By:  /s/ David S. Wilkerson
Larry S. McDevitt, NC #5032
David S. Wilkerson, NC #35742
11 North Market Street
Asheville, NC 28801
Tel: 828-258-2991
Fax: 828-255-0255
dwilkerson@vwlawfirm.com


HEINS MILLS & OLSON, P.L.C.

Vincent J. Esades
310 Clifton Avenue
Minneapolis, MN 55403
Tel: 612-338-4605
vesades@heinsmills.com


PRETI, FLAHERTY, BELIVEAU
& PACHIOS, LLP

Gregory P. Hansel
One City Center
P.O. Box 9546
Portland, ME 04112-9546
Tel. 207-791-3000
Fax 207-791-3111
ghansel@preti.com